# Ninth Circuit No. 19-55335

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

RICHARD ABUKA, et al.

*Plaintiff and Appellant,*

v.

THE CITY OF EL CAJON, et al.

*Defendants and Appellees.*

C.D. Cal. Case No. CV 17-00089 BAS (NLS)
consolidated with
Case No. CV 17-00347 BAS (NLS)

Appeal from an Order Granting Summary Judgment
United States District Court For the Southern District of California
District Judge Cynthia Bashant, Presiding

## APPELLANT'S OPENING BRIEF

Rodney Diggs
Ivie, McNeill & Wyatt
444 South Flower Street, Suite 1800
Los Angeles, CA 90071
(213) 489-0028
rdiggs@imwlaw.com

*Attorneys for Appellant*
Richard Abuka

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

STATUTORY AND CONSTITUTIONAL AUTHORITIES..................4

ISSUE(S) PRESENTED ........................................................................5

STATEMENT OF THE CASE..............................................................5

    **A.**    Factual Background...........................................................5

    **B.**    Plaintiff Files the Instant Lawsuit ....................................15

    **C.**    Defendants File a Motion for Summary Judgment on the Basis That Plaintiffs Claims Failed to Establish Any Constitutional Violations or are Otherwise Barred by the Doctrine of Qualified Immunity ...........16

STANDARD OF REVIEW ..................................................................18

SUMMARY OF THE ARGUMENT ...................................................18

ARGUMENT .....................................................................................19

I.    THE DISTRICT COURT EXPLICITLY FOUND THAT THE FACTS AND CIRCUMSTANCES OF THE DEADLY ENCOUNTER WEIGHED IN FAVOR OF A FINDING OF EXCESSIVE FORCE BY OFFICER GONZALVES ...............................................................................19

    II.    The District Court Granted Defendants' Motion as to Plaintiffs' fourteenth Amendment Retaliation Claim Based on an Erroneous Interpretation of Material Facts as well as an Improper Application of the Appropriate Legal Standard. .......................................................22

    A.    Legal Standard...................................................................22

B.     The District Court incorrectly applied the more stringent "Purpose to Harm" standard of culpability, as opposed the less stringent "Deliberate Indifference" standard.....................................................23

C.     Analogous Ninth Circuit Precedent and a Growing Consensus of Circuit Courts Hold that Police Officers are Constitutionally Liable for Creating the Need to Use Lethal Force .........................................24

CONCLUSION ......................................................................................................27

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**

Abraham v. Raso, 183 F.3d 279, 291 (3d Cir.1999) ..............................30

*Allen v. Muskogee*, 119 F.3d 837, 839-841 (10th Cir. 1997) ..................29

*Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) ..................21

*Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) .....................23

*Conn v. City of Reno*, 572 F.3d 1047, 1054 (9th Cir. 2009)...................20

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998)...................... 26,27

*Elliot–Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010) ............26

Estate of Ceballos v. Husk, 919 F.3d 1204, 1215 (10th Cir. 2019)........30

*Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994).......................23

*Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011)...........23

*Graham v. Connor*, 490 US 386 (1989) ...........................................2, 22

*Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013)....27

*Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004) ................................20

Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 372 (9th Cir.1998)....27

*Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004) .....................20

*Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) .........................27

*Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009)..............................25

*S.R. Nehad v. Browder*, No. 18-55035, 2019 WL 3023147,
   at *3 (9th Cir. July 11, 2019) ........................................................3, 28

*Saucier v. Katz*, 533 U.S. 194, 201 (2001)). .........................................25

*Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir. 2003) ........21

*St. Hilaire v. City of Laconia*, 71 F.3d 20, 26 (1st Cir.1995) ..................30

*Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003) ................................................................................................................20

*Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)................................................ 22, 30

*Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018).....................24

*Young v City of Providence Napolitano*, 404 F.3d 4 (1st Cir. 2005).......................29

**Statutes**

28 U.S.C. § 1291 ...................................................................................................3

28 U.S.C. § 1331 ...................................................................................................3

28 U.S.C. § 1343 ...................................................................................................3

28 U.S.C. § 1367 ...................................................................................................3

42 U.S.C. § 1983 ...................................................................................................9

Fed. R. App. P. 4(a)(1)(A) ....................................................................................4

Fed. R. Civ. P. 56(c).............................................................................................12

*Penal Code* § 148(a)(1).......................................................................................3, 9

*Penal Code* § 415(2) .............................................................................................9

# INTRODUCTION

On the afternoon of September 27, 2016, Defendant Officer Richard Gonsalves shot and killed Plaintiffs' decedent, Alfred Okwera Olango ("Alfred Olango" or "Mr. Olango"), outside the Los Panchos taco shop located at 777 Broadway in El Cajon, California. Gonsalves fired four rounds at Mr. Olango during the incident. Mr. Olango was not armed with any kind of weapon at the time of the shooting. The shooting of Mr. Olango occurred approximately one minute and thirty-three seconds after Gonsalves made contact with him. (1EOR048) This action followed.

Mr. Olango is unfortunately one of 8.3 Million American adults with schizophrenia or bipolar disorder mental illness (3.3% of the population). Like Mr. Olango, approximately 3.9 Million of the affected American adults go untreated in any given year. Research shows that People with untreated mental illness are 16 times more likely to be killed during a police encounter than other civilians approached or stopped by law enforcement, according to a new study released today by the Treatment Advocacy Center.[1]

---

[1] *People with Untreated Mental Illness 16 Times More Likely to Be Killed By Law Enforcement*, Treatment Advocacy Center, https://www.treatmentadvocacycenter.org/key-issues/criminalization-of-mental-illness/2976-people-with-untreated-mental-illness-16-times-more-likely-to-be-killed-by-law-enforcement- (last visited July. 30, 2019).

Officers receive extensive training on how to deal with mentally unstable individuals. Unfortunately, many officers, like Officer Gonzalves in the instant case, choose to ignore their training, and in doing so can create dangerous situations that justify the use of deadly force.  Some Circuits only analyze an officers use of force based on circumstances presented *at the moment* the force was deployed.  Likewise many courts tend to give officers the benefit of the doubt when faced "tense, uncertain, or rapidly evolving" situation that warrants latitude pursuant to *Graham v. Connor*, 490 US 386 (1989).

However, as discussed below, this situation did not present the type of "tense, uncertain, or rapidly evolving" situation that warrants latitude pursuant to *Graham*. Moreover*,* analogous Ninth Circuit precedent and a growing consensus of federal circuit Courts now hold that a Court's inquiry should not only analyze the use of force at the exact moment that it is deployed, but should also analyze whether the Defendant's own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.  In light of this standard, the actions of Officer Gonzalves could be determined to have unreasonably created the need for the use of deadly force.

Through this appeal, Plaintff respectfully submits that, in light of the growing epidemic of mental illness, and the increasing trend of mentally ill persons being gunned down during police encounters, the Court should adopt the analogous

reasoning of the Ninth Circuit court in *S.R. Nehad v. Browder*, No. 18-55035, 2019 WL 3023147, at *3 (9th Cir. July 11, 2019)("Nehad") as well as the precedent established by Sister Circuits, that holds officers liable for "conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force." *Romero v. Board of County Comm'rs*, 60 F.3d 702, 705 n. 5 (10th Cir.1995). This reasoning should apply with particular force to police encounters with individuals that the officer reasonably suspects to be mentally ill. Based on the aforementioned reasons and all reasons discussed below, Plaintiff asks the Court to reverse the District Court's grant of summary judgment on Plaintiff's Fourteenth Amendment Claims, and remand the case for a jury trial on those claims.

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and § 1343 (civil rights). The Court of Appeals for the Ninth Circuit has jurisdiction under 28 U.S.C. § 1291. On March 7, 2019, the District Court entered its summary judgment order granting Defendants-Appellees' motion for summary judgment in its entirety. In its order, the Court dismissed Plaintiff-Appellant's Fourteenth Amendment substantive due process claim of interference with familial association on the basis that Defendant's conduct did not meet the purpose to harm standard of culpability. Plaintiff-Appellant timely filed a Notice of

Appeal on March 21, 2019.  *See* Fed. R. App. P. 4(a)(1)(A);  Judgment was entered by the District Court on March 7, 2019. This appeal follows.

## STATUTORY AND CONSTITUTIONAL AUTHORITIES

All relevant statutory and/or constitutional authorities appear in the Addendum to this brief.

# ISSUE(S) PRESENTED

1. Whether the District Court erred in analyzing Plaintiff's Fourteenth Amendment claim under the more stringent "Purpose to Harm" standard of culpability, as opposed the less stringent "Deliberate Indifference" standard.

# STATEMENT OF THE CASE

**A.** <u>Factual Background</u>

<u>"5150" Call Regarding Alfred Olango</u>

At 2:03 p.m. on September 27, 2016, a "5150"[2] call was dispatched over the El Cajon Police Department's radio frequency. The call asked Officer Gonsalves and Officer Stephen McDaniel ("Officer McDaniel") to respond to the Arco gas station at 871 North Mollison in reference to a "5150" subject who had been seen "walking into traffic." Additional information about the call was also put out on the computers in Gonsalves' and McDaniel's patrol vehicles between 12:57 p.m. and 2:01 p.m. (2EOR082-83). The call details stated that the subject's name was Alfred Olango, and that the person who had called about Mr. Olango was one of his siblings, and that Mr. Olango was mentally unstable, was walking in traffic,

---

[2] The term "5150" is a generic 1 term for a call involving a subject who may be mentally ill, or is having a mental breakdown call (Exhibit 1, Gonsalves Depo., at 44:9-11.)

and was almost getting hit by cars. The call details also included an entry at 12:58 p.m. which stated "no weapons."

Officers Gonsalves and McDaniel recall receiving information which indicated that Mr. Olango was mentally unstable. (1EOR042-43; 2EOR102) Gonsalves and McDaniel never received any information which indicated that Mr. Olango had injured anyone, had threatened anyone, had committed any crime, had entered or attempted to enter any businesses, or was armed with any kind of weapon. (*Id.*) Both officers were aware that it was Mr. Olango's sister who had called 911. (1EOR042; 1EOR068)

## The Events Preceding the Fatal Shooting of Alfred Olango

After the call regarding Mr. Olango was put out over the radio, Officers Gonsalves and McDaniel went to the Arco gas station at the corner of Broadway and Mollison. While the officers were at the Arco, Mr. Olango's sister, Lucy Olango (hereinafter sometimes referred to as "Lucy"), approached them. Gonsalves claims he stayed in his vehicle and did not speak to Lucy while she was at the Arco. (1EOR042). Lucy testified that she did speak to Gonsalves at the Arco. (2EOR130; 2EOR134). Lucy told Gonsalves that Mr. Olango was "having a difficult time" and "felt like somebody was following him." (2EOR134-135)

Lucy also told Gonsalves that Mr. Olango had been crossing the street, was not doing well, and needed help. (2EOR135). Gonsalves asked Lucy if Mr. Olango had a gun or any other weapons, and Lucy said that he did not. (2EOR135). At some point, Lucy indicated that she had last seen Mr. Olango near the southwest corner of Broadway and Mollison. (2EOR092; 1EOR057). Officer Gonsalves told Officer McDaniel that he was going to go look for Mr. Olango, and left the Arco. (2EOR093; 1EOR044). This was the extent of the tactical plan that Gonsalves and McDaniel formulated before they made contact with Mr. Olango. (1EOR044-45; 2EOR093-95). Gonsalves had OC spray on his person and a baton and a beanbag shotgun in his vehicle, but did not have a Taser. (1EOR064-65). McDaniel had a Taser. The officers did not discuss the deployment of any less lethal force options at any time. (1EOR044-45)

Lucy stayed at the Arco and talked to Officer McDaniel after Officer Gonsalves left. (2EOR130-131; 2EOR135). Lucy told McDaniel that Mr. Olango was "in distress." (2EOR131-132). Lucy also told McDaniel that Mr. Olango thought that someone was watching him, or that people were after him. (2EOR133). Lucy did not tell McDaniel that Mr. Olango was trying to get hit by cars, had injured anyone, or had any weapons, and did not give McDaniel any information which suggested that Mr. Olango was a danger to others. (2EOR087-91). McDaniel believed that Mr. Olango might be schizophrenic.

7

<u>Officer Gonsalves' Version of Events Surrounding the Shooting</u>

Mr. Olango was walking in the parking lot of a strip mall near the Los Panchos taco shop when Officer Gonsalves first saw him. Mr. Olango was not committing any crimes when Gonsalves first saw him, and Gonsalves was not contacting him for the purpose of arresting him for the commission of a crime. (1EOR048-49). Gonsalves broadcast that he had located Mr. Olango at approximately 2:10:19 p.m. Gonsalves got out of his vehicle and told Mr. Olango that he needed to talk to him. Mr. Olango stopped about fifteen to twenty feet away from Gonsalves. Gonsalves claims he saw a "bulge" in Mr.Olango's right front pocket after he exited his vehicle. Gonsalves also claims that Mr. Olango put his right hand into his right pocket after he noticed this "bulge."

Officer Gonsalves told Mr. Olango to take his hand out of his pocket. Mr. Olango did not remove his hand from his pocket or say anything in response to this command. Gonsalves repeated his command for Mr. Olango to remove his hand from his pocket in an increasingly louder and sterner voice, and motioned as if he was taking his own hand out of his pocket several times. Mr. Olango did not remove his hand from his pocket, and started to back away from Gonsalves. Gonsalves drew his firearm and followed Mr. Olango as Mr. Olango walked

backwards. (1EOR047; 1EOR051; 1EOR054). At the time that Gonsalves drew his firearm, he believed that Mr. Olango may be suffering from a mental illness or going through some kind of mental breakdown. (1EOR055). Mr. Olango continued to walk backwards "at a normal pace," and also moved sideways at times. Officer Gonsalves moved towards Mr. Olango as Mr. Olango backed away from him and "matched" Mr. Olango's movements. (1EOR054). Mr. Olango never ran away from Gonsalves, did not attempt to enter any of the businesses in the area, and did not assault or threaten any civilians in the area at any time. (1EOR059). Gonsalves claims he continued give Mr. Olango commands to remove his hand from his pocket, and that in response to one of these commands, Mr. Olango said the word "no" a single time. (1EOR050). Gonsalves heard someone yelling behind him around this time. Gonsalves looked over his shoulder, saw Lucy Olango behind him, and told her to stay back or get back. (1EOR061-63). Officer Gonsalves claims that after he told Lucy to stay back or get back, Mr. Olango removed his right hand from his pocket, got into a "shooting stance," and pointed an object that had a "metal barrel" "directly" at him. Gonsalves claims that Mr. Olango was fifteen feet away from him at this time. (1EOR060-61). Gonsalves fired four rounds at Mr. Olango in less than a second. (1EOR031; 1EOR033). Gonsalves claims that throughout the time in which he was firing, Mr. Olango had his arms extended out in front of his body in a "shooting stance," and

was facing him and pointing an object that he believed was a firearm at his head. (1EOR035-36; 1EOR041, 1EOR065-067). Gonsalves also claims that he stopped shooting after he saw Mr. Olango start to the fall to the ground and drop the object he had, and that Mr. Olango did not start to fall to the ground until after he fired his fourth shot. (1EOR065-067).

<u>Officer McDaniel's Version of Events Surrounding the Shooting</u>

When Officer McDaniel saw Mr. Olango for the first time, Mr. Olango was moving backwards and from side to side, and Officer Gonsalves was telling him to get his hand out of his pocket. (2EOR095-096; 2EOR098-099; , 2EOR118-119.) It appeared to McDaniel that Mr. Olango was "nervous," "scared," and looking for "some kind of avenue of escape." (2EOR119).

McDaniel drove into the parking lot of the Los Panchos taco shop, got out of his vehicle, and saw Gonsalves pointing his firearm at Mr. Olango. (2EOR100-232). McDaniel claims that Mr. Olango was walking backwards and moving from side to side at this time, and still had his hand in his pocket. McDaniel decided to "close the distance" on Mr. Olango and use a Taser to incapacitate him. (2EOR103).

McDaniel drew his Taser and moved closer to Mr. Olango. Officer McDaniel claims he saw Mr. Olango take his right hand out of his pocket, bring his left arm up to support it, and point an object that he believed was a firearm at Officer Gonsalves. McDaniel claims he saw a "cylindrical piece of metal-looking silver" protruding from Mr. Olango's hand. (2EOR104). McDaniel was more than fifteen away from Mr. Olango when he allegedly saw the object protruding from Mr. Olango's hand, and testified that he was only able to see one to two inches of the object, and did not know what it was. (2EOR105; 2EOR120). McDaniel heard gunshots after Mr. Olango took the object out of his pocket. McDaniel continued to move towards Mr. Olango and fired his Taser at Mr. Olango when he got to within ten to twelve feet of him. (2EOR107-108). Mr. Olango's body locked up and fell to the ground after McDaniel fired the Taser. (2EOR109). McDaniel did not fire any shots at Mr. Olango during the incident. (2EOR106-107.)

## The Video Recordings Depicting the Shooting

The shooting of Mr. Olango was captured on a surveillance camera recording and a cell phone recording. (See Exhibit C to Gonsalves Decl.; Exhibit C to Declaration of Rick Sutherland, Dkt. No. 54-4 ["Sutherland Decl."].) The surveillance camera recording depicts Mr. Olango backing up in the parking lot of

the Los Panchos taco shop, and then turning to his right and walking towards the curved portion of the drive thru lane as Officer Gonsalves comes into view with his firearm in his left hand and follows him. Mr. Olango's right hand appears to be inside his right pocket at this time; his left hand is visible. When Mr. Olango reaches the curved portion of the Los Panchos drive-thru lane, he turns around to face Gonsalves and stops. Gonsalves continues to approach Mr. Olango and then stops.

After Gonsalves stops, Mr. Olango takes several steps to his right. Gonsalves appears to raise his firearm and point it at Mr Olango, and mirrors Mr. Olango's movements by stepping to the left. Mr. Olango then backs up towards the bed of a white pickup truck as Gonsalves moves towards him, stops for a moment, and then takes several more steps to his right as McDaniel's patrol vehicle comes into view. Gonsalves continues to mirror Mr. Olango's sideways movements by stepping to the left. When Mr. Olango reaches the area in front of the rear door on the driver's side of the pickup truck, he spins around and takes a couple of steps to his left as McDaniel gets out of his vehicle. Gonsalves continues to mirror Mr. Olango's sideways movements by stepping to the right.

The rest of the incident was captured on the surveillance camera recording and the cell phone recording. These recordings depict Mr. Olango backing up towards the pickup truck as Gonsalves stops. A woman can be heard saying

"officer don't shoot him" on the cell phone recording. Mr. Olango looks to his left and takes a couple of steps to his left. Gonsalves continues to mirror Mr. Olango's sideways movements by stepping to the right. A woman screams something to the effect of "take your hands out your pockets," and Mr. Olango turns, appears to look in the direction of the woman's voice, and then takes a couple of steps to his right. Gonsalves continues to mirrors Mr. Olango's sideways movements by stepping to the left.

Mr. Olango stops after he takes a couple of steps to his right and a male voice says "take your hand out of your pocket." Mr. Olango extends his right arm and hand out to the right side of his body. It is unclear whether Mr. Olango has anything in his right hand when he removes it from his pocket and extends it out to his side. While Mr. Olango is extending his right arm and hand out to his side, a male voice says "you need to back up." Mr. Olango's right arm and hand disappear from view, and a male voice says "shut the fuck up." Mr. Olango then steps to his right, extends his left arm and hand out in front of his body, and points his left arm and hand at Lucy Olango as Gonsalves mirrors his movements by stepping to the left. Mr. Olango then lowers his left arm and hand as Gonsalves steps in front of him and McDaniel walks towards him with his arms outstretched in front of his body. Mr. Olango raises both of his arms, extends them out in front of his body with his hands together, points his hands in Gonsalves' direction, and then falls

forward and rotates away from Gonsalves as he goes down to the ground. Four gunshots can be heard on the cell phone recording.

## The Officers' Training Regarding the Use of Deadly Force and Field Contacts with Mentally Unstable Subjects

Officers are trained that deadly force should be used only when other means of control are unreasonable or have been exhausted. (1EOR033-34; 2EOR72-73) Officers are also trained that they are no longer authorized to use deadly force after a threat ceases to exist. (1EOR030; 1EOR032). Officers are also trained to utilize cover, concealment, and distance during encounters with persons who are armed or may be armed with a firearm or other weapon. (1EOR046; 2EOR122-123)

The tactics and methods that officers are taught in dealing with a person who may be mentally ill include calming the situation, which involves taking time to assess the situation, providing reassurance that officers are there to help, giving the person time to calm down, moving slowly, assuming a quiet, nonthreatening manner when approaching and conversing with the person, and avoiding physical contact if no violence or destructive acts have taken place. (3EOR180; 2EOR075-076) Officers are also trained to not threaten the person with arrest or in any other manner since threats can create additional fright, stress, or potential aggression.

(3EOR180).  Roger Clark, Plaintiffs' police practices expert, has opined that Officers Gonsalves and McDaniel did not use trained and expected tactics and methods during the incident involving Mr. Olango. (3EOR178).  These tactical deficiencies are discussed in detail in Mr. Clark's Rule 26 Report.  (3EOR178-188)  The El Cajon Police Department also has a Psychiatric Emergency Response Team (PERT) which consists of a clinician who rides with an officer and conducts evaluations of persons who are experiencing a mental health crisis. (2EOR042-043).  The PERT Team was not requested during the incident involving Mr. Olango. (2EOR115; 2EOR119).

**B.**   Plaintiff Files the Instant Lawsuit

Plaintiff Richard Abuka, father of Decedent Alfred Olango, filed the instant lawsuit on January 13, 2017,[3] asserting that Defendants violated Plaintiff's substantive due process rights when they utilized excessive force in detaining Alfred Olango, firing four shots and ultimately killing the decedent.  Plaintiff asserts that the aforementioned actions violated his Fourteenth Amendment right to be free from unwarranted interference with his familial association with the decedent, pursuant

---

[3] Plaintiff Rozier originally brought claims for unreasonable use of deadly force; unconstitutional policy, practice, or custom under Monell; and wrongful death, (17-cv-347, ECF No. 5), but subsequently dismissed her wrongful death claim. (17-cv-89, ECF No. 51.) Abuka's case and Rozier's case have been consolidated. (17-cv-89, ECF No. 40.)

Fourteenth Amendment rights by interfering with his familial association with Decedent Alfred Olango.

### C. Defendants File a Motion for Summary Judgment on the Basis That Plaintiffs Claims Failed to Establish Any Constitutional Violations or are Otherwise Barred by the Doctrine of Qualified Immunity

On October 1, 2018 Defendants filed a motion for summary judgment asserting that the Defendant Officers' use of force was objectively reasonable under the circumstances facing the officers, and thus their conduct did not amount to excessive force in violation of the Fourth Amendment. In the alternative, Defendants argued that the Officers were entitled to qualified immunity as to Plaintiffs' claims regarding excessive force, because the law regarding each of the claims was not clearly established at the time of the incident at issue.

Additionally, Defendants argued that Defendant Officer Gonsalves is entitled to qualified immunity as to Plaintiff's Fourteenth Amendment claim, "because there was no violation of Olango's Fourth Amendment rights and, notwithstanding, Gonsalves did not engage in "conscience shocking" conduct because he did not shoot Olango with a purpose to harm unrelated to a legitimate law enforcement objective."

On March 7, 2019, the Court granted Defendants motion in its entirety, on the grounds that: 1) the excessive force claims were barred by the Doctrine of Qualified Immunity; and 2) Plaintiff's Fourteenth Amendment claims did not meet the requisite standard of culpability necessary to establish a constitutional violation.

Plaintiff now appeals the second of the Court's bases for its ruling. As will be discussed in depth below, the Court's Order relied primarily on the Court's incorrect application of the appropriate legal standards governing Plaintiffs' claims, as well as an erroneous interpretation of material factual issues. Accordingly, Plaintiffs respectfully request that the Court reverse the District Court's order granting summary judgment as to Plaintiff's Fourteenth Amendment claims (First and Second Causes of Action) and that the case be remanded for jury trial.

## STANDARD OF REVIEW

The District Court's grant of summary judgment is reviewed *de novo*. *Conn v. City of Reno*, 572 F.3d 1047, 1054 (9th Cir. 2009). The District Court's decision to grant qualified immunity is reviewed *de novo*. *Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004). This Court's review is governed by the same standard, Fed. R. Civ. P. 56(c). *See Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003).

On review, the Court should determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the District Court correctly applied the relevant substantive law. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). The Court should not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *See Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999). Summary judgment is not proper if material factual issues exist for trial. *See Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir. 2003).

## SUMMARY OF THE ARGUMENT

I.     THE DISTRICT COURT ERRED BY GRANTING DEFENDANTS' MOTION AS TO PLAINTIFFS' FOURTEENTH AMENDMENT RETALIATION CLAIM BASED ON AN ERRONEOUS INTERPRETATION OF MATERIAL FACTS AS WELL AS AN IMPROPER APPLICATION OF THE APPROPRIATE LEGAL STANDARD.

**ARGUMENT**

I.  THE DISTRICT COURT EXPLICITLY FOUND THAT THE FACTS
    AND CIRCUMSTANCES OF THE DEADLY ENCOUNTER WEIGHED
    IN FAVOR OF A FINDING OF EXCESSIVE FORCE BY OFFICER
    GONZALVES[4]

Although the District Court ultimately ruled that Plaintiffs' excessive force claims were barred by the Doctrine of Qualified Immunity, the Court went to great lengths to make clear that it had "grave concerns about how the officers handled this situation in its totality." In assessing the reasonableness of the Officers' use of force, the Court consulted the factors identified by citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)(holding that the reasonableness inquiry requires a court to evaluate "the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985))."

Additionally, Ninth Circuit Courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a

---

[4] In their Motion for Summary Judgment Defendants assert that there can be no Fourteenth Amendment Violation in the absence of a Fourth Amendment Violation. However, the Court clearly found disputed issues of material fact with regard to the Fourth Amendment claims, and rather dismissed the claims based on Qualified Immunity grounds. This does not preclude Plaintiff's Fourteenth Amendment Claim. "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). "Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396 (1989) (citing *Terry v. Ohio,* 392 U.S. 1, 20–22 (1968)).

Based on the aforementioned factors, the District Court found that multiple facts weighed in favor of a finding of excessive force, including: 1) When the officers were called to the scene, there is no dispute that Olango had not committed any crimes, had not injured or threatened anyone, and had not entered or attempted to enter any business; 2) Olango had not put anyone in danger but himself; 3) The officers arrived at the scene, spoke to Lucy only very briefly and then split up with no plan on how to help or ensure the safety of Olango; 4) The officers did not discuss how to de-escalate the situation or how to approach Olango without leading to an altercation; 5) The officers did not call a Psychiatric Emergency Response Team ("PERT") team; 6) Olango did not attempt to run away from Gonsalves, nor did he

initially make any indication of intent to harm others or commit any crimes; 7) It is undisputed that Gonsalves thought Olango might be under the influence of a narcotic or might be suffering from a mental illness; 8) Olango's perceptible mental instability should have given the officers pause in determining how to handle the situation. *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1034 (9th Cir. 2018) (finding "indications of mental illness create a genuine issue of material fact about whether the government's interest in using deadly force was diminished"); 9) Gonsalves had non-lethal options available in his patrol car but did not equip himself with any of them; 10) Gonsalves could have given Olango more space and attempted to speak with him rather than backing him into an enclosed space "[I]f officers believe a suspect is mentally ill, they 'should . . . ma[k]e a greater effort to take control of the situation through less intrusive means." Vos, 892 F.3d at 1034 n.9 (quoting Bryan, 630 F.3d at 829); 11) Gonsalves did not warn decedent that deadly force would be used.

The Court found that based on "the totality of the evidence and the weighing of the [aforementioned] factors, the Court finds there are disputed issues of material fact as to whether the use of deadly force was reasonable in the situation." However, the Court ultimately found that despite these material factual disputes, Defendants were nonetheless entitled to a Qualified Immunity defense. In making this

determination, the Court consulted the factors cited in *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) which directs that a qualified immunity analysis "involves two inquiries: (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established in light of the specific context of the case." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

As discussed above, the Court found that Plaintiffs' offered sufficient evidence to overcome the first prong of the Qualified Immunity Analysis. However, the Court ruled that Plaintiffs could not overcome the second prong, by identifying clearly established authority that provided Defendant Gonzalves with "fair warning that [his] conduct was unlawful." *Elliot–Park v. Manglona*, 592 F.3d 1003, 1008 (9th Cir. 2010). On that basis, the Court granted Defendant's Motion for Summary Judgment as to Plaintiffs' excessive force claims

II. <u>THE DISTRICT COURT GRANTED DEFENDANTS' MOTION AS TO PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM BASED ON AN ERRONEOUS INTERPRETATION OF MATERIAL FACTS AS WELL AS AN IMPROPER APPLICATION OF THE APPROPRIATE LEGAL STANDARD.</u>

A. <u>Legal Standard</u>

The Fourteenth Amendment's substantive due process clause protects against the arbitrary or oppressive exercise of government power. *See County of Sacramento*

*v. Lewis*, 523 U.S. 833 (1998). Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. "[T]he Due Process Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento*, 523 U.S. at 845–47.

"In determining whether excessive force shocks the conscience, the court must first ask 'whether the circumstances are such that actual deliberation [by the officer] is practical.'" *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 372 (9th Cir.1998) (internal quotation marks omitted)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013) (citing *Wilkinson*, 610 F.3d at 554).

B.   The District Court incorrectly applied the more stringent "Purpose to Harm" standard of culpability, as opposed the less stringent "Deliberate Indifference" standard.

The District Court found that "it [was] clear that Officer Gonzalves was in an escalating situation" and that "Gonzalves did not have time to deliberate or consider the use of force [in the moment that Olango moved into a shooting stance while holding the vape device in his hand]. However, the District Court's inquiry begins and ends at the moment Olango pointed his vape device at Gonzalves. However, as discussed below, analogous Ninth Circuit precedent and a growing consensus of federal circuit Courts now holds that a Court's inquiry should not only analyze the use of force at the exact moment that it is deployed, but should also analyze whether the Defendant's own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.

C.  Analogous Ninth Circuit Precedent and a Growing Consensus of Circuit Courts Hold that Police Officers are Constitutionally Liable for Creating the Need to Use Lethal Force

The Ninth Circuit recently published a new opinion on an excessive force claim in the matter of *S.R. Nehad v. Browder*, No. 18-55035, 2019 WL 3023147, at *3 (9th Cir. July 11, 2019)("*Nehad*"). In the *Nehad* case, the shooting officer argued that there was a quickly escalating situation which necessitated the use of deadly force. In support of this, Defendant stated that he shot the decedent only five seconds

after exiting the vehicle.  Id. at 5.  While the Court recognized that officers must often make split-second judgments, it squarely held that an officer may not unnecessarily create their own sense of urgency. Id.  In *Nehad*, the officer drove his vehicle within, about, 20 feet of the Decedent who was walking at a slow pace. There, the decedent's expert opined that the officer had "a lot of time" to determine what to do before shooting, but "squandered all the opportunities tactically."  The Court concluded that based on this evidence, "a reasonable factfinder could conclude that any sense of urgency was of [the shooting officer's] own making."

Additionally many of this Court's sister circuits have likewise explained that the "reasonableness of [an officer's] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force."  *Allen v. Muskogee*, 119 F.3d 837, 839-841 (10th Cir. 1997)("Allen"); *See also Young v City of Providence Napolitano*, 404 F.3d 4 (1st Cir. 2005) (stating that "[t]he rule in this circuit is that once it is clear that a seizure has occurred, '"the court should examine the actions of the government officials leading up to the seizure."'" (citing *St. Hilaire v. City of Laconia*, 71 F.3d 20, 26 (1st Cir.1995).  Based on this, the First Circuit held that "police officers' actions for [the purpose of determining if a Constitutional violation occurred] need not be examined solely at the "moment of the shooting." Id.; This First Circuit rule is consistent with

the Supreme Court's mandate that we consider these cases in the "totality of the circumstances." Id. (citing Tennessee v. Garner, 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); see Graham, 490 U.S. at 396) ; See also Abraham v. Raso, 183 F.3d 279, 291 (3d Cir.1999).

In Allen, the Tenth Circuit court explained further that they will consider an "officers conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force." Id. See also Estate of Ceballos v. Husk, 919 F.3d 1204, 1215 (10th Cir. 2019) (observing that the circumstances in Allen were closely analogous to the Ceballos situation in which Defendant Officer shot a mentally unstable decedent within a minute of arriving on scene.)

In the instant case, Plaintiff's expert presented substantial and compelling evidence, that the Defendant officers failed to follow their training and they acted dangerously in the situation. The fact that this encounter only took 90 seconds to ripen into a deadly force incident is completely attributable to the unduly hasty actions of Officer Gonzalves. As noted by the Court, there was no imminent threat of danger to any person, and Officer Gonzalves was on notice that Plaintiff was mentally unstable but unarmed and not threatening any person or property. Despite these facts, Officer Gonzalves prematurely and aggressively pursued and cornered a mentally unstable decedent, even though he was trained to respond to such situations differently. The pace of events did not present the type of "tense, uncertain, or

rapidly evolving" situation that warrants latitude pursuant to Graham. See Graham, 490 U.S. at 397).

In light of the growing epidemic of mental illness, and the increasing trend of mentally ill persons being gunned down during police encounters, the Court should adopt the analogous reasoning of the *Nehad* Court, and the precedent established by Sister Circuits, that holds officers liable for "conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force." This reasoning should apply with particular force to police encounters with individuals that the officer reasonably suspects to be mentally ill.

Accordingly, Plaintiffs respectfully request that the Court reverse the District Court's order granting summary judgment as to Plaintiff's Fourteenth Amendment claims, and that the case be remanded for jury trial on these claims

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court reverse the District Court's order granting summary adjudication as to Plaintiff's Fourteenth Amendment claims (First and Second Causes of Action) and that the case be remanded for jury trial.

Dated:  August 22, 2019          **IVIE, McNEILL & WYATT**

By: _/s/ **Rodney S. Diggs**_____
       **RODNEY S. DIGGS, Esq.**
       **Attorneys for Plaintiffs**
       **RICHARD ABUKA**

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Plaintiffs hereby certify that they are not aware of any related cases pending before this Court.

Date: August 22, 2019          **IVIE, McNEILL & WYATT**

By: */s/ Rodney S. Diggs*

RODNEY S. DIGGS
**Attorneys for Appellant**
**RICHARD ABUKA**

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,854 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2017, Times New Roman 14-point font.


Date: August 22, 2019          **IVIE, McNEILL & WYATT**


                    **By:** *__/s/ Rodney S. Diggs__*
                              RODNEY S. DIGGS
                              **Attorneys for Appellant**
                              **RICHARD ABUKA**

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: August 22, 2019        **IVIE, McNEILL & WYATT**

        **By: */s/ Rodney S. Diggs***
        RODNEY S. DIGGS
        **Attorneys for Appellant**
        **RICHARD ABUKA**

# ADDENDUM

# TABLE OF CONTENTS

**Page**

**Statutes**

28 U.S.C. § 1291 ......................................................................ADD 1

28 U.S.C. § 1331 ......................................................................ADD 1

28 U.S.C. § 1343 ......................................................................ADD 1

42 U.S.C. § 1983 ......................................................................ADD 3

Fed. R. App. P. 4(a)(1)(A) .....................................................ADD 3

Fed. R. Civ. P. 56(c).................................................................ADD 4

**PERTINENT ENACTMENTS**

**28 U.S.C. § 1291. Final decisions of District Courts**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

**28 U.S.C. § 1331. Federal question**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

**28 U.S.C. § 1343. Civil rights and elective franchise**

(a)  The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

(1)   To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42;

(2)   To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to occur and power to prevent;

(3)   To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

(4)   To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

(b)  For purposes of this section—

(1)   the District of Columbia shall be considered to be a State; and

(2)   any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## 42 U.S.C. § 1983.  Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

## Fed. R. App. P. 4(a)(1)(A).  Appeal In A Civil Case

(a) Appeal in a Civil Case.

(1) Time for Filing a Notice of Appeal.

(A) In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after entry of the judgment or order appealed from.

**Fed. R. Civ. P. 56(c).  Summary Judgment**

(c) Procedures.

(1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4) Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.