Ninth Circuit No. 19-55335

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

## RICHARD ABUKA, et al.

*Plaintiff and Appellant,*

v.

## CITY OF EL CAJON, et al.

*Defendants and Appellees,*

---

C.D. Cal. Case No. CV 17-00089 BAS (NLS)
Consolidated with
Case No. CV 17-00347 BAS (NLS)

Appeal from an Order Granting Summary Judgment
United States District Court For the Southern District of
California
District Judge Cynthia Bashant, Presiding

---

## APPELLEES' BRIEF

---

*Lee H. Roistacher, Esq. (SBN 179619)
Mitchell D. Dean, Esq. (SBN 128926)
Heather E. Paradis, Esq. (SBN 276650)
Daley & Heft, Attorneys at Law
462 Stevens Avenue, Suite 201, Solana Beach, CA  92075
Tel: (858) 755-5666 / Fax:  (858) 755-7870
Attorneys for Defendants and Appellees City of El Cajon and
Richard Gonsalves

# TABLE OF CONTENTS

INTRODUCTION.............................................................1

STATEMENT OF JURISDICTION.................................7

STATEMENT OF FACTS.............................................8

A.      Undisputed Facts...............................................8

B.      Video Footage And Additional Evidence..................13

STATEMENT OF THE CASE.......................................17

STATEMENT OF ISSUES..........................................19

STANDARD OF REVIEW...........................................20

SUMMARY OF ARGUMENT.......................................22

ARGUMENT..........................................................23

A.      This Court Should Affirm Gonsalves' Judgment
        On Waiver Grounds Because Abuka Cannot
        Establish Raising To The District Court The
        Arguments He Makes To This Court......................23

B.      Notwithstanding Abuka's Waiver, This Court
        Should Affirm Gonsalves' Judgment Because
        Qualified Immunity Insulates Him From
        14th Amendment Liability...................................25

1.      Qualified Immunity...........................................25

2.      The Undisputed Evidence Establishes No 14th
        Amendment Violation By Gonsalves......................29

a.   There Is No Evidence That Gonsalves Acted With
     A Purpose To Harm Olango Unrelated To The
     Legitimate Law Enforcement Objective Of Self
     Defense…………………………………............................32

b.   Abuka's Assertion Of District Court Error
     Is Meritless………………………………………………36

3.   Abuka Cites To No Clearly Established Law…………40

CONCLUSION………………………………………………41

CERTIFICATE OF COMPLIANCE PURSUANT TO
FED. R. APP. 32(a)(7)(c) AND CIRCUIT RULE 32-1
FOR CASE NO. 19-55335……………………………………42

CERTIFICATE OF SERVICE…………………………………43

# TABLE OF AUTHORITIES

## Cases

*Abraham v. Raso*
    183 F.3d 279 (3d Cir. 1999)....................................36

*A.D. v. California Highway Patrol*
    712 F.3d 446 (9th Cir. 2013)............................33, 34

*Allen v. Muskogee, Okl.*
    119 F.3d 837 (10th Cir. 1997)..........................36, 37

*Billington v. Smith*
    292 F.3d 1177 (9th Cir. 2001)...............................33

*Breithaupt v. Abram*
    352 U.S. 432 (1957).............................................30

*Bryan County v. Brown*
    520 U.S. 397 (1997).............................................38

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986).............................................21

*Chadd v. United States*
    794 F.3d 1104 (9th Cir. 2015)...............................24

*Chaves v. Las Vegas Metropolitan Police Dept.*
    648 F. Appx. 657 (9th Cir. 2016)..........................33

*City and County of San Francisco v. Sheehan*
    135 S. Ct. 1765 (2015)....................................26, 28

*City of Escondido, Cal. v. Emmons*
    139 S. Ct. 500 (2019)..........................................28

*County of Los Angeles v. Mendez*
    137 S. Ct. 1539 (2017)…………………………………33, 36

*County of Sacramento v. Lewis*
    523 U.S. 833 (1998)………………………………....29, 30, 39

*District of Columbia v. Wesby*
    138 S. Ct. 577 (2018)…………………………………..26, 27, 28

*Estate of Ceballos v. Husk*
    919 F.3d 1204 (10th Cir. 2019)…………………………36

*Felarca v. Birgeneau*
    891 F.3d. 809 (9th Cir. 2018)………………….27, 28, 40

*Foster v. City of Indio*
    908 F.3d 1204 (9th Cir. 2018)……………………….....34

*Glenn v. Washington County*
    673 F.3d 864 (9th Cir. 2011)……………………….…21

*Gonzalez v. City of Anaheim*
    747 F.3d 789 (9th Cir. 2014)………………....…..29, 31, 35

*Gregory v. County of Maui*
    523 F.3d 1103 (9th Cir. 2008)…………………….…...21

*Hamby v. Hammond*
    821 F.3d 1085 (9th Cir. 2016)……………………….…29

*Hayes v. County of San Diego*
    736 F.3d 1223 (9th Cir. 2013)………………….…..31, 32, 34

*Hernandez v. City of Pomona*
    46 Cal.4th 501 (2009)…………………………………..10

*Hooper v. City of Chula Vista*
    212 Cal.App.3d 442 (1989)………………………………10

*In re EPD Inv. Co., LLC.*
    821 F.3d 1146 (9th Cir. 2016)................................23

*In re O'Brien*
    312 F.3d 1135 (9th Cir. 2002)...........................24, 25

*Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*
    752 F.2d 1401 (9th Cir. 1985)................................23

*Keates v. Koile*
    883 F.3d 1228 (9th Cir. 2018)................................26

*Kirkpatrick v. County of Washoe*
    843 F.3d 784 (9th Cir. 2016)................................26

*Kisela v. Hughes*
    138 S. Ct. 1148 (2018).....................................27, 28

*Kramer v. Cullinan*
    878 F.3d 1156 (9th Cir. 2018)...............................29

*Messerschmidt v. Millender*
    565 U.S. 535 (2012)........................................25, 41

*Moreland v. Las Vegas Metro. Police Dep't.*
    159 F.3d 365 (9th Cir. 1998)..............................30, 34

*Mullenix v. Luna*
    136 S. Ct. 305 (2015)........................................28

*Nehad v. Browder*
    929 F.3d 1125 (9th Cir. 2019).........................*Passim*

*Patel v. Kent School Dist.*
    648 F.3d 965 (9th Cir. 2011)................................38

*Pearson v. Callahan*
555 U.S. 223 (2009)...............................................26

*Porter v. Osborn*
546 F.3d 1131 (9th Cir. 2017).........................*Passim*

*S. B. v. County of San Diego*
864 F.3d 1010 (9th Cir. 2017)................................26

*Scott v. Harris*
550 U.S. 372 (2007)...............................................21

*Shafer v. County of Santa Barbara*
868 F.3d 1110 (9th Cir. 2017)................................28

*Sharp v. County of Orange*
871 F.3d 901 (9th Cir. 2017).................................41

*Smith v. City of Hemet*
394 F.3d 689 (9th Cir. 2005).................................10

*U.S. ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*
355 F.3d 1140 (9th Cir. 2004)...............................21

*Wilkinson v. Torres*
610 F.3d 546 (9th Cir. 2010)...........................*Passim*

*Woodrum v. Woodward County*
866 F.2d 1121 (9th Cir. 1989)...............................30

*White v. Pauly*
137 S. Ct. 548 (2017)................................25, 27, 28

*West v. City of Caldwell*
931 F.3d 978 (9th Cir. 2019)................................28

*Young v. City of Providence ex rel. Napolitano*
404 F.3d 4 (1st Cir. 2005)......................................36

*Zion v. County of Orange*
    874 F.3d 1072 (9th Cir. 2017)......................30, 31, 32

## Statutes

42 U.S.C. § 1983..................................................................6

Cal. Pen. Code, § 148............................................10

Cal. Pen. Code, § 835a..........................................10

Fed. R. Civ. P. 56..................................................21

# INTRODUCTION

On September 27, 2016, Lucy Olango (Lucy) called 911 because her brother Alfred Olango (Olango) was acting erratically and walking into traffic.[1]  El Cajon police officers Richard Gonsalves and Josh McDaniel responded to the call. Upon initial contact by Gonsalves in a strip mall parking lot, Olango put his right hand in his right front pants pocket where a visible bulge existed and refused Gonsalves' commands to remove his hand.  When Olango eventually removed his right hand he was holding a dark gun-shaped object with a protruding metal barrel, and he got into a classic "shooting stance" (i.e., legs spread, slight crouch, hands together, arms pointed straight out) while pointing

---

[1] Before going any further, Gonsalves must dispel a materially false assertion made by appellant on the first page of his opening brief where he states: "Olango [was] unfortunately one of 8.3 Million [sic] American adults with schizophrenia or bipolar disorder mental illness (3.3% of the population."  Opening Brief, p. 1.  Nowhere in the brief is there a citation to evidence in the record establishing Olango was schizophrenic or bipolar.  This is unsurprising because there isn't any.  This intentional attempt to mislead is seriously concerning.

the object directly at Gonsalves.  Reasonably believing

Olango had a gun and his life was in danger, Gonsalves shot

four times in less than one second.  Olango did not survive.

After the shooting it was determined Olango was holding a

smoking device called a "vape."

The first picture below is a still frame from video of the

incident, and the second is a picture of the vape that was in

Olango's hands[2]:



---

[2] *See* Excerpts of Record, pages 4, 5 (ER 4, 5); Supplemental
Excerpts of Record, pages 19, 127 (SER 19, 127).



Olango's father, appellant Richard Abuka, filed suit against Gonsalves under 42 U.S.C. section 1983 (section 1983) asserting a claim for loss of familial association under the 14th Amendment. Olango's wife and daughters also filed suit under section 1983 asserting Fourth Amendment claims on Olango's behalf and 14th Amendment loss of familial association claims on their own behalf.

The district court granted summary judgment for Gonsalves and against Abuka finding qualified immunity barred Abuka's 14th Amendment claim. The district court correctly concluded no 14th Amendment violation existed

because the undisputed evidence established Gonsalves made a "snap judgment" to use deadly force in rapidly evolving circumstances for the legitimate law enforcement objective of self defense. But even if factual disputes on this issue exist, Gonsalves is still entitled to qualified immunity because no clearly established law existed at the time of the incident putting all reasonable law enforcement officers on clear notice that the use of deadly force under the particular circumstances facing Gonsalves violated the 14th Amendment.

## STATEMENT OF JURISDICTION

Gonsalves agrees with Abuka's jurisdictional statement.

**STATEMENT OF FACTS**

## A.    Undisputed Facts[3]

Around 2:03 p.m. on September 27, 2016, Gonsalves and McDaniel were dispatched to check on a potentially mentally ill man walking into traffic (i.e., Olango).  SER 2, ¶ 1.  Lucy Olango had called the police about Olango.  SER 6, ¶ 69.  Gonsalves had never previously met, seen or heard of Olango.  SER 5 ¶ 61.

Gonsalves arrived at the corner of Broadway and Mollison in El Cajon, California at approximately 2:08 p.m., where he was met by McDaniel.  SER 2, ¶¶ 2, 3.  Neither had yet seen Olango.  SER 2, ¶ 4.  Lucy approached and McDaniel got out of his car to talk to her.  SER 2, ¶¶ 5, 6.  Gonsalves stayed in his car.  SER 2, ¶ 7.  Lucy said she last saw Olango near the southwest corner of Broadway and Mollison.  SER 2, ¶ 8.  Gonsalves left to find Olango.  SER 2,

---

[3] These facts come from the parties' Joint Statement Of Undisputed Material Facts.  SER 1-8.  Abuka for some reason neither included this document in his excerpts of record nor cites to the electronic version on the district court's case filing system, ECF Doc. No. 60.

¶ 9.  McDaniel asked Lucy a few more questions then left to look for Olango.  SER 2, ¶¶ 10, 11.

Around 2:10 p.m., Gonsalves saw Olango in a parking lot near a taco shop in a strip mall.  SER 2, ¶ 12.  Gonsalves drove to the area.  SER 2, ¶ 13. After making eye contact with Olango, Gonsalves got out of his patrol car, and said "something . . . like 'Hey, I need to talk to [y]ou.'"  SER 2, ¶¶ 14-16.  Gonsalves was about fifteen to twenty feet from Olango and saw a bulge in Olango's right front pants pocket.  SER 2-3, ¶¶ 17-18.

Olango then put his right hand into his right front pants pocket.  SER 3, ¶ 19.  Gonsalves clearly, calmly, and repeatedly told Olango to remove his hand, but Olango didn't comply and said "no" at least once.  SER 3, ¶¶ 20-27.  Gonsalves also several times imitated the motion of taking a hand out of his own pocket as a visual clue to Olango to remove his hand in case Olango did not understand

Gonsalves' verbal commands.  SER 3, ¶ 28.  Olango backed

away with his hand still in his pocket.[4]  SER 3, ¶ 29.

Around 2:10:19 p.m., Gonsalves broadcast: "I'm going

to be on the subject at 833 Broadway, noncompliant, got his

hand in his pocket."  SER 3, ¶ 30.  Gonsalves thought Olango

might be under the influence of narcotics.  SER 3, ¶ 31.

Olango continued to move away from Gonsalves with his

right hand still in his pocket, despite Gonsalves' repeated

commands to remove it.  SER 4, ¶¶ 33-35.  Gonsalves did not

want Olango entering any of the businesses in the strip mall

---

[4] Olango's refusal to obey Gonsalves' commands constituted a
violation of California Penal Code § 148(a)(1).  *Smith v. City
of Hemet*, 394 F.3d 689, 696-697 (9th Cir. 2005) (en banc).
Thus, Gonsalves "was not obliged to simply let [Olango] go"
or undertake some other action to avoid a conflict with him,
but was duty bound to press forward.  *Hernandez v. City of
Pomona,* 46 Cal.4th 501, 518-519 (2009); *see* Cal. Pen. Code,
§ 835a ("A peace officer who makes or attempts to make an
arrest need not retreat or desist from his efforts by reason of
the resistance or threatened resistance of the person being
arrested."); *Hooper v. City of Chula Vista,* 212 Cal.App.3d
442, 453 (1989) ("police officer has a duty to the community
to carry out his or her obligation to promote law-abiding,
orderly conduct, including, where necessary, to detain and
arrest suspected perpetrators of offenses").

or running into traffic where he could get hurt. SER 4, ¶¶ 36, 37.

Olango continued walking backward and sideways toward a fence and parked car. SER 4, ¶ 38. Wanting to contain Olango until backup arrived, Gonsalves followed Olango matching his movements. SER 4, ¶ 39. Olango still had his right hand in his pocket and continued to ignore Gonsalves' commands to remove it. SER 4, ¶ 40-42. Gonsalves un-holstered his gun, keeping it along his left upper thigh. SER 4, ¶ 43. Gonsalves did not have a taser. SER 3, ¶ 32. Olango's hand remained in his pocket. SER 5, ¶ 46.

McDaniel arrived to the side of Olango, removed his Taser to provide an alternative less lethal force option, and began moving closer to Olango so he would be close enough to use his Taser. SER 5, ¶¶ 47-49.

Lucy suddenly appeared and began yelling at Olango. SER 5, ¶ 50.  Gonsalves again told Olango to remove his hand from his pocket.[5]  SER 5, ¶ 51.

Gonsalves and Olango were less than twenty feet apart when Olango suddenly removed an object from his pocket, holding it in both of his hands.  SER 5, ¶¶ 53-54.  Gonsalves fired four shots at Olango in less than one second, and McDaniel deployed his Taser.  SER 5, ¶¶ 55, 57.  Olango was shot in the right upper arm, the left chest, left shoulder and neck.  SER 6-7, ¶¶ 78-86.  Gonsalves reported shots fired at 2:11:52 p.m., and immediately requested medical care for Olango.  SER 5, ¶¶ 58-59.  Minutes later paramedics arrived to treat Olango, but Olango did not survive.  SER 5, ¶¶ 59-60.

---

[5] Gonsalves wasn't the only one.  Lucy and a witness were also telling Olango to remove his hand from his pocket or to put his hands up.  SER 83, 84:16-88:23, 94:18-25, 102:12-17, 106:24-107:24, 118, 119:8-121:5, 177, 181:1-13.

About one minute and thirty-three seconds elapsed from Gonsalves first contact with Olango and the shooting. SER 6, ¶ 65.

After the shooting, the officers discovered Olango was not armed with a weapon and the object in his hands was a smoking device called a "vape." SER 5-6, ¶¶ 62, 64.

## B. Video Footage And Additional Evidence

It is undisputed that videos captured a portion of the encounter between Gonsalves and Olango, including events preceding, during and after the shooting, and accurately show what Olango did. SER 4-5, ¶¶ 45, 52.

As the videos show, Lucy suddenly appears at the scene and was screaming behind Gonsalves at Olango. SER 30, 34 ¶ 14, 59-60, 65-69, 77, 78:5-6 (Exh. C, Video 2.1 (14:09:52)). Concerned with how close Lucy was to him, Gonsalves turned toward her and said "stay back" while pointing at her with his right arm/hand across his chest.[6] *Id.*

---

[6] Abuka thinks the video shows Olango pointing at Lucy with his right hand, then sticking it back into his pocket, and

(Exh. C, Video 1.2 (00:21-00:27), Video 1.3 (00:21-00:27));

SER 30, 34 ¶ 15, 129, 136:6-22, 140:11-18.

As the videos show, and as Gonsalves, McDaniel and the witnesses confirm, immediately after Gonsalves turned from addressing Lucy, Olango finally, and very quickly, took his right hand out of his right front pants pocket, joined it together with his left hand like he had a gun and simultaneously put his body into a classic "shooter's stance" while pointing directly at Gonsalves the dark object with a cylindrical protruding metal barrel that he had removed from his pocket.[7] SER 30, 34 ¶ 14, 59-60, 65-69, 77, 78:5-6 (Exh. C, Video 1.1 (00:00-00:15), Video 1.2 (00:32-00:39), Video 1.3 (00:32-00:39), Video 2.1 (14:09:49-14:09:56)); SER 30, 35 ¶¶ 16-17, 62-64, 70, 73 ¶ 8-9, 83, 89:12-92:17, 93:15-

_____

then removing it again with the vape. Opening Brief, p. 13. This obviously didn't happen.

[7] One witness heard Olango yell something like "shoot me" and believed Olango was attempting "suicide by cop." SER 148, 149:3-22, 158:17-159:23. McDaniel heard Olango say something like "fuck this", "fuck that", or "fuck it." SER 165, 169:2-12.

94:5, 118, 121:2-124:3, 126, 127, 129, 131:24-134:4, 135:6-12, 148, 150:2-155:17, 156:21-157:10, 159:16-23, 161:2-162:15, 165, 169:2-21, 170:24-171:3, 177, 178:20-183:11, 185:9-187:11, 188:15-25, 190:14-195:23.

Seeing Olango in a "shooter's stance" holding an object with a metal barrel pointed at him, Gonsalves thought Olango had a gun and believed Olango was going to shoot him (as did McDaniel and the witnesses). SER 30, 35 ¶ 17, 62-64, 70, 73 ¶¶ 8-9, 83, 89:17-92:17, 93:15-94:5, 95:25-97:10, 102:12-23, 108:21-24, 129, 130:17-25, 131:21-134:4, 135:6-12, 137:25-138:1, 141:24-145:4, 148, 153:17-154:13, 159:16-23, 165, 169:2-21.

In fact, Olango actually mimicked the firing of a gun (i.e., recoil action) with his arms. SER 30, 34 ¶ 14, 59-60, 65-69, 77, 78:5-6 (Exh. C, Video 1.2 (00:35-00:38), Video 1.3 (00:35-00:38)). And Gonsalves actually first ducks out of the way, and only then did Gonsalves shoot Olango. *Id.*

Because McDaniel thought Olango was going to shoot Gonsalves, he deployed his Taser, shocked at how fast

Olango "drew" and "got the drop" on Gonsalves.  SER 70, 73
¶¶ 8-9.  Indeed, McDaniel initially thought Olango may have
shot Gonsalves and fired the Taser at Olango hoping it
would stop Olango from shooting again.  *Id.*

Fearing for his life, Gonsalves shot Olango four times
in rapid succession and he stopped firing when he believed
the threat Olango posed had been eliminated.  SER 30, 35
¶ 17, 129, 130:17-25, 131:21-134:14, 135:6-12, 137:25-138:1,
141:12-145:4.  At no time prior to the shooting did Olango
ever remove his right hand from his pocket.  SER 30, 34 ¶
14, 59-60, 65-69, 77, 78:5-6 (Exh. C, Videos 1.1, 1.2, 1.3, 2.1);
SER 83, 93:4-94:5, 177, 178:20-183:11.

Before shooting Olango, Gonsalves was not upset or
mad at Olango and harbored no ill will toward him.  SER 30,
35 ¶ 20.

A post-mortem toxicology test on Olango revealed
levels of cocaine metabolites consistent with Olango having
recently consumed a toxic amount of cocaine, and his
behavior throughout the incident was consistent with

cocaine overdose. SER 9-13, 197-199; ECF Doc. Nos. 59-1, 59-2.

## STATEMENT OF THE CASE

Abuka maintained 14th Amendment loss of familial association based section 1983 claims against Gonsalves. SER 216-229. Olango's wife and daughters maintained on Olango's behalf a section 1983 cause of action against Gonsalves asserting a violation of Olango's Fourth Amendment rights. ECF Doc. No. 5. (Case No. 17-cv-00347). They also maintained their own section 1983 claim for loss of familial association under the 14th Amendment. *Id.*

Asserting qualified immunity, Gonsalves moved for summary judgment on all claims. ECF Doc. No. 54. Relevant here, Gonsalves argued qualified immunity barred the 14th Amendment claims because he did not violate the 14th Amendment and there was no clearly established law at the time of the incident dictating that his conduct under

the particular circumstances he faced violated the 14th Amendment.[8]  SER 18-29.

Abuka filed no written opposition to Gonsalves' motion. 1 ER 21:13-15; 3 ER 195-203.  He did join in the summary judgment opposition by Olango's wife and daughters, but that opposition didn't contest Gonsalves' assertion of immunity from 14th Amendment liability.  ECF Doc. No. 56 (opposition); SER 14-15 (joinder).  Abuka knew this as he specifically joined in the "Opposition to Defendants' Motion for Summary Judgment as to Plaintiffs' *Fourth Amendment excessive force claims*."  SER 15 (emphasis added).

Despite no written opposition to Gonsalves' motion for summary judgment on the 14th Amendment claims, Abuka "opposed" the motion at the hearing.  1 ER 21:13-16.  What

---

[8] Gonsalves also argued the absence of a violation of Olango's Fourth Amendment rights rendered Abuka's 14th Amendment claims meritless.  Although Gonsalves believes the district court erroneously found disputed issues of material fact on the existence of a Fourth Amendment violation, it is unnecessary for Gonsalves to show that error because Gonsalves is otherwise clearly entitled to qualified immunity from Abuka's 14th Amendment claim.

he argued in opposition is unknown because the reporter's transcript from the hearing is not part of the appellate record. The district court exercised its discretion not to consider the lack of written opposition as a concession to the granting of summary judgment. 1 ER 21:13-18.

On March 7, 2019, the district court granted Gonsalves summary judgment finding no 14th Amendment violation. 1 ER 21:12-22:22. Because of the absence of a 14th Amendment violation, the district court did not address the issue of clearly established law. *Id.* The district court entered judgment for Gonsalves on March 7, 2019. ECF Doc. No. 65. Abuka timely appealed. 1 ER 24.

## STATEMENT OF ISSUES

1. Did Abuka waive the arguments he makes on appeal because he cannot establish making them to the district court due to his lack of written opposition to Gonsalves' motion for summary judgment on the 14th Amendment claim and his failure to designate the reporter's transcript from the hearing on Gonsalves' motion?

2. Is Gonsalves entitled to qualified immunity from Abuka's 14th Amendment loss of familial association claims because the undisputed evidence proves that Gonsalves used deadly force in a rapidly escalating situation in pursuit of the legitimate law enforcement objective of self-defense and there is no evidence of any ulterior motive?

3. Is Gonsalves entitled to qualified immunity from Abuka's 14th Amendment loss of familial association claims because no clearly established law existed on September 27, 2016 providing notice to all reasonable law enforcement officers that Gonsalves' use of deadly force under the particular circumstances Gonsalves faced violated the 14th Amendment?

The answer to all three questions is "yes" and affirmance is proper for any or all of these reasons.

## STANDARD OF REVIEW

A moving party is entitled to summary judgment upon demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  Fed. R.

Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In ruling on a defendant's summary judgment motion, the court views the facts in the light most favorable to the plaintiff only if there is a genuine dispute as to those facts.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  But in cases dealing with an officer's use of force, the court cannot adopt a plaintiff's version of facts if blatantly contradicted by a video or other evidence in the record.  *Id.*; *Gregory v. County of Maui*, 523 F.3d 1103, 1108 (9th Cir. 2008).  Rather, the court must "view[] the facts in the light depicted by the videotape" or other record evidence.  *Scott*, 550 U.S. at 380-381.

This Court reviews both summary judgment and qualified immunity de novo.  *Glenn v. Washington County,* 673 F.3d 864, 870 (9th Cir. 2011).  This Court affirms on any ground appearing in the record, even if not relied upon by the district court.  *U.S. ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1144 (9th Cir. 2004).

# SUMMARY OF ARGUMENT

Abuka waived all claims of error because he cannot establish making his appellate arguments to the district court. Abuka submitted no written opposition to Gonsalves' summary judgment motion. He joined only in opposition by Olango's wife and daughters to summary judgment on Fourth Amendment claims, claims Abuka didn't maintain against Gonsalves. Abuka apparently made some argument during the hearing on Gonsalves' motion, but it is impossible to tell what arguments he made because the reporter's transcript from the hearing is not part of the appellate record and nothing in the record outlines his arguments.

Notwithstanding Abuka's waiver, qualified immunity insulates Gonsalves from 14th Amendment liability. Because only around 90 seconds elapsed from Gonsalves' initial contact with Olango to his use of deadly force, and the need to use deadly force arose so suddenly that there was no time for practical deliberation, the purpose to harm standard for 14th Amendment liability applies. And the evidence

conclusively establishes Gonsalves never acted with a purpose to harm Olango unrelated to a legitimate law enforcement objective. Rather, Gonsalves' "snap decision" to use deadly force was pursuant to the legitimate law enforcement objective of self defense and there is no evidence of some ulterior motive for Gonsalves' use of force. Moreover, no clearly established law existed on September 27, 2016 putting all reasonable officers on clear notice that Gonsalves' use of deadly force under the particular circumstances he faced violated the 14th Amendment.

## ARGUMENT

**A.    This Court Should Affirm Gonsalves' Judgment On Waiver Grounds Because Abuka Cannot Establish Raising To The District Court The Arguments He Makes To This Court**

Absent exceptional circumstances, arguments not made to the district court are waived on appeal. *In re EPD Inv. Co., LLC.*, 821 F.3d 1146, 1152 (9th Cir. 2016); *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985);

*see Chadd v. United States*, 794 F.3d 1104, 1109 n.4 (9th Cir. 2015) ("[I]t is well established that an appellate court will not reverse a district court on the basis of a theory that was not raised below.").

As stated earlier, Abuka filed no written opposition to Gonsalves' summary judgment motion. 1 ER 21:13-15; 3 ER 195-203. Although Abuka joined in the written opposition to Gonsalves' motion filed by Olango's wife and daughters, that opposition did not oppose qualified immunity from 14th Amendment liability. ECF Doc. No. 56 (opposition); SER 14-15 (joinder). So Abuka clearly raised no written arguments to the district court.

Abuka apparently made some argument at the summary judgment hearing opposing summary judgment on his 14th Amendment claims. 1 ER 21:13-16. But the reporter's transcript for that hearing isn't part of the appellate record, and whatever arguments Abuka made are not described anywhere in the record. There is accordingly no way to tell what Abuka argued below. *See In re O'Brien*,

312 F.3d 1135, 1137 (9th Cir. 2002) ("As with briefing inadequacies, the failure to present a sufficient record can itself serve as a basis for summary affirmance ....").

Abuka has waived his appellate arguments and this court should affirm for this reason.

## B. Notwithstanding Abuka's Waiver, This Court Should Affirm Gonsalves' Judgment Because Qualified Immunity Insulates Him From 14th Amendment Liability

### 1. Qualified Immunity

"[Q]ualified immunity is important to society as a whole and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (quotation marks and citations omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotation marks and citations omitted). Qualified immunity protects law enforcement

officers from liability for "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted).

Qualified immunity is a "demanding" and "exacting" standard. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *City and County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015); *see S. B. v. County of San Diego*, 864 F.3d 1010, 1015, 1017 (9th Cir. 2017) (hearing the Supreme Court "loud and clear" and recognizing qualified immunity's "'exacting standards'"); *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 792 (9th Cir. 2016) (en banc) (recognizing qualified immunity's "'exacting standard'"); *see also Keates v. Koile*, 883 F.3d 1228, 1234-1235 (9th Cir. 2018) ("'[D]efendants are entitled to qualified immunity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' [Citation] The Supreme Court has emphasized that this is a low bar ….").

"[O]fficers are entitled to qualified immunity under §
1983 unless (1) they violated a federal statutory or
constitutional right, and (2) the unlawfulness of their
conduct was 'clearly established at the time.'" *Wesby*, 138 S.
Ct. at 589. "A plaintiff must prove both steps of the inquiry
to establish the officials are not entitled to immunity from
the action." *Felarca v. Birgeneau*, 891 F.3d. 809, 815 (9th
Cir. 2018).

"Qualified immunity attaches when an official's
conduct does not violate clearly established statutory or
constitutional rights of which a reasonable [officer] would
have known. While [the Supreme] Court's case law do[es]
not require a case directly on point for a right to be clearly
established, existing precedent must have placed the
statutory or constitutional question beyond debate. In other
words, immunity protects all but the plainly incompetent or
those who knowingly violate the law." *White*, 137 S. Ct. at
551 (quotation marks and citations omitted); *Kisela v.*

*Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam); *Wesby*, 138 S. Ct. at 589-590.

The Supreme Court has repeatedly made it clear that "clearly established" law cannot be ascertained from general principals of constitutional law but only from precedent squarely addressing the specific conduct and circumstances at issue. *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curium); *Kisela,* 138 S. Ct. at 1152; *Wesby*, 138 S. Ct. at 590; *White*, 137 S. Ct. at 552; *Sheehan*, 135 S. Ct. at 1776; *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam); *see West v. City of Caldwell*, 931 F.3d 978, 982-983 (9th Cir. 2019) (summarizing Supreme Court qualified immunity precedents); *see also Felarca*, 891 F.3d at 822 ("[W]e must first 'defin[e] the law at issue in a concrete, particularized manner.' *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).").

As this Court has said, "[s]o long as existing case law 'did not preclude' an official from reasonably believing that his or her conduct was lawful, the official has a right to

qualified immunity.  [Citation]." *Kramer v. Cullinan*, 878
F.3d 1156, 1163 (9th Cir. 2018).  "[T]he fact-specific, highly
contextualized nature of the [clearly established] inquiry
does not depend on which particular constitutional right a
given plaintiff claims the officials have violated." *Hamby v.
Hammond*, 821 F.3d 1085, 1091 (9th Cir. 2016).

### 2.     The Undisputed Evidence Establishes No 14th Amendment Violation By Gonsalves

The parent of a person killed by police can assert a
14th Amendment substantive due process claim for the loss
of familial association.  *Wilkinson v. Torres*, 610 F.3d 546,
554 (9th Cir. 2010).  Because substantive due process is not
a "'font of tort law to be superimposed upon whatever
systems may already be administered by the States,'"
*County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998), a
parent maintaining such a claim bears the onerous burden of
establishing the officer's conduct "shocked the conscience."
*Id.* at 846-848; *Gonzalez v. City of Anaheim,* 747 F.3d 789,
797 (9th Cir. 2014) (en banc).

Negligent conduct does not shock the conscience. *Lewis*, 523 U.S. at 849; *Woodrum v. Woodward County,* 866 F.2d 1121, 1126 (9th Cir. 1989). Nor does conduct constituting a "conscious disregard" for one's life. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998) (citing *Lewis*, 523 U.S. at 852-854). Indeed, "only the most egregious official conduct" is conscience shocking and conscience shocking conduct is only that conduct violating the "decencies of civilized conduct." *Lewis*, 523 U.S. at 846. The "shocks the conscience" standard describes conduct that is "so 'brutal' and 'offensive' that it does not comport with traditional ideas of fair play and decency." *Breithaupt v. Abram*, 352 U.S. 432, 435 (1957); *see, e.g., Zion v. County of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) ("head-stomping a suspect curled up in the fetal position" "is exactly the kind of 'brutal' conduct the Due Process Clause protects against as it 'is bound to offend even hardened sensibilities.'").

"In determining whether excessive force shocks the conscience, the court must first ask 'whether the

circumstances are such that actual deliberation [by the officer] is practical.' [Citation]." *Wilkinson*, 610 F.3d at 554. Where time exists for "actual deliberation," "deliberate indifference" may suffice to shock the conscience. *Zion,* 874 F.3d at 1077; *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2017).

But in fast paced situations where an officer makes "snap judgments" in reaction to rapidly changing or escalating circumstances, an officer's use of force is not conscience shocking unless the officer acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Id.*; *Gonzalez*, 747 F.3d at 797; *Hayes v. County of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013); *Wilkinson*, 610 F.3d at 554. In these situations, 14th Amendment liability exists only in the "rare situations" where "the officer intended to harm, terrorize or kill" the suspect without regard for a legitimate law enforcement objective, *Porter,* 546 F.3d at 1140, or where the officer intended "to bully a

suspect or get even." *Wilkinson*, 610 F.3d at 554; *see, e.g.,*
*Zion*, 874 F.3d. at 1077.

**a.    There Is No Evidence That Gonsalves Acted With A Purpose To Harm Olango Unrelated To The Legitimate Law Enforcement Objective Of Self Defense**

Around 90 seconds elapsed between Gonsalves' first contact with Olango and the shooting.  SER 6 ¶ 65.  And Gonsalves' decision to shoot Olango was most certainly and indisputably instantaneous upon believing his life was in danger after seeing Olango pointing what he believed to be a gun directly at him.  *See ante*, pp. 8-16.  The purpose to harm standard clearly applies because the situation evolved quickly and Gonsalves had no time for actual and practical deliberation before shooting.  *See Hayes*, 736 F.3d at 1230 ("Here, the district court correctly applied the purpose-to-harm standard based on the deputies' snap decision that Hayes represented an immediate threat. ... The decision to employ deadly force in reaction to seeing the knife was sudden and did not include deliberation.");  *Porter*, 546 F.3d at 1139 (purpose to harm standard applied during five-

minute altercation between the officers and victim that "evolve[ed]" quickly in "fast paced" circumstances forcing officers to make "repeated split-second decisions"); *Wilkinson,* 610 F.3d at 554 (deliberation impractical "when a suspect's evasive actions force the officer to act quickly"); *Billington v. Smith*, 292 F.3d 1177, 1191 (9th Cir. 2001) (150 seconds "is not a comfortably ample period" for deliberation), *abrogated on the grounds, County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017); *see also Chaves v. Las Vegas Metropolitan Police Dept.,* 648 F. Appx. 657, 658 (9th Cir. 2016) ("The district court correctly held that because the officers encountered a 'rapidly escalating' situation that quickly evolved within minutes, [plaintiff] was required to show that the officers acted with a 'purpose to harm' unrelated to a legitimate law enforcement objective.").

"'The purpose to harm standard is a subjective standard of culpability.'" *Nehad v. Browder,* 929 F.3d 1125, 1139 (9th Cir. 2019) (quoting *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013)). "It is the intent to

inflict force beyond that which is required by a legitimate law enforcement objective that 'shocks the conscience' and gives rise to liability under § 1983 ...." *Porter*, 546 F.3d at 1140.

Self-protection is unquestionably a legitimate law enforcement objective. *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018); *A.D.*, 712 F.3d at 454; *Moreland*, 159 F.3d at 373. That is what existed here. Gonsalves shot Olango because he thought Olango was going to shoot him after Olango suddenly removed an object from his pocket, got into a shooter's stance, and pointed what Gonsalves believed was a gun directly at him. *See ante*, pp. 8-16. The evidence therefore conclusively demonstrates Gonsalves' use of force was not "conscience shocking" but unquestionably related to the legitimate law enforcement objective of self-protection, *a conclusion Abuka does not dispute*. *See Hayes*, 736 F.3d at 1230-1231 ("Appellant makes no claim that the deputies acted with a purpose to harm unrelated to the legitimate law-enforcement objective of defending themselves, arguing

only that the deliberate-indifference standard should have been applied. Indeed, there is no evidence that the deputies fired their weapons for any purpose other than self-defense. Accordingly, Appellant failed to support her substantive due process claim."); *see also Nehad,* 929 F.3d at 1139 ("Here, there is no evidence that Browder fired on Nehad for any purpose other than self-defense, notwithstanding the evidence that the use of force was unreasonable.").

Moreover, there is no evidence in the record establishing a motive by Gonsalves for shooting Olango other than self-protection. *See Gonzalez*, 747 F.3d at 797-798 (affirming summary judgment on Fourteenth Amendment claim because plaintiffs produced no evidence of ulterior motives underlying use of force). Indeed, Gonsalves did not know Olango, harbored no ill will toward Olango, and wasn't upset or angry with Olango. SER 5, ¶ 61, 30, 35 ¶ 20.

### b.    Abuka's Assertion Of District Court Error Is Meritless

Abuka asserts the district court erred by applying the purpose to harm standard rather than the deliberate indifference standard.  Abuka believes the district court erred by failing to consider Gonsalves' conduct in creating the need to use deadly force when determining the applicable standard.  Opening Brief, pp. 24-24.  Abuka is wrong, and his position contravenes this Court's established 14th Amendment jurisprudence.

Abuka cites to no authority supporting his position that an officer's conduct in creating a situation necessitating the use of force plays any role in the analysis of what standard applies.[9]  None of the out of circuit cases he cites involved the 14th Amendment.[10]  And *Nehad* is certainly not

---

[9] Such a rule would likely run afoul of the Supreme Court's rejection of this Circuit's "provocation doctrine." *See Mendoza,* 137 S. Ct. at 1546.

[10] *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1209, 1213-1215 (10th Cir. 2019), *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 9-14 (1st Cir. 2005), *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999), and *Allen v.*

supportive. *Nehad* did discuss how the officer's conduct created the need to use deadly force, but this discussion was limited to the court's Fourth Amendment analysis. *Nehad*, 929 F.3d at 1134-1135. *Nehad* did not use the officer's creation of the need to use force in the 14th Amendment analysis. *Id.* at p. 1139.

Moreover, precedent defeats Abuka's argument. Although authority seemingly exists indicating an officer's creation of the need to use deadly force might potentially be relevant in a 14th Amendment analysis on the issue of the officer's motive in using deadly force, it is clearly not relevant to the issue of whether the purpose to harm or deliberate indifference standard applies. *See Porter*, 546 F.3d at 1140 ("[T]he record contains facts suggesting that Osborn's own conduct created and agitated this escalating situation and that his reactions were disproportionate to the situation he faced. Such facts, however, as we explain below,

---

*Muskogee, Okl.*, 119 F.3d 837, 839, 840-841 (10th Cir. 1997) all involved the Fourth Amendment.

are more relevant to the next step of the analysis, when the district court determines on remand whether they may show Osborn's purpose was to harm Casey for reasons unrelated to legitimate law enforcement objectives.")

Further, Abuka never demonstrates how applying the deliberate indifference standard to Gonsalves' conduct would make any difference in the result. Both standards require "conscience shocking" conduct. *Porter*, 546 F.3d at 1137. Although the purpose to harm standard is more onerous than the deliberate indifference standard, the latter is still "'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" *Patel v. Kent School Dist.*, 648 F.3d 965, 974 (9th Cir. 2011) (quoting *Bryan County v. Brown*, 520 U.S. 397, 410 (1997)). Like the purpose to harm standard, the deliberate indifference standard requires evidence of subjective intent. "The state actor must recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the

plaintiff.  In other words, the defendant knows that something is going to happen but ignores the risk and exposes the plaintiff to it."  *Id.* (quotation marks, citations and edits omitted).

Abuka points to no conscience shocking conduct by Gonsalves.  At best, Abuka points to evidence that "[Gonsalves] failed to follow [his] training and [he] acted dangerously in the situation."  Opening Brief, p. 26. Assuming this is true, it is at best negligence and such conduct does not "shock the conscience."  *Lewis*, 523 U.S. at 849.  Nor does Abuka point to any evidence that Gonsalves knew his actions would result in Olango doing what he did, or what Abuka did was otherwise an obvious consequence of Gonsalves' action. [11]

---

[11] Abuka also erroneously thinks he automatically gets a jury trial if this Court finds deliberate indifference is the proper standard.  If the district court applied the wrong standard, Abuka would, at best, get a remand for consideration of Gonsalves' summary judgment motion under the deliberate indifference standard. *See, e.g., Porter*, 546 F.3d at 1132 ("The district court found that the parents presented sufficient evidence that the officer's conduct violated their constitutional rights [under the 14th Amendment] to

### 3. Abuka Cites To No Clearly Established Law

Aubka bore the burden of showing clearly established law. *Felarca*, 891 F.3d at 822. Abuka does not address this issue in his briefing. He accordingly fails to meet his burden. Regardless, Abuka is clearly advocating for a principal of law that is not clearly established. No case holds what he wants this Court to hold; that is, the 14th Amendment analysis requires assessing whether the officer created the need to use force to determine whether the purpose to harm or deliberate indifference standard applies.

Regardless, no Supreme Court or Ninth Circuit case holds that an officer violates the 14th Amendment when responding with deadly force under the specific circumstances Gonsalves faced - someone pointing what is reasonably believed to be a gun directly at the officer. Nor is

---

warrant a jury trial, but we are compelled to conclude it did so by applying an incorrect standard of culpability to the officer's actions. We therefore reverse and remand for reconsideration of the officer's culpability under the proper standard and whether he is entitled to qualified immunity on summary judgment.").

there a consensus of persuasive authority outside of the Supreme Court or Ninth Circuit settling the constitutional question such that the issue is beyond debate. *See Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) (describing what precedent suffices to show clearly established law). Certainly, Gonsalves was not "plainly incompetent" and did not "knowingly violate the law." *Messerschmidt,* 565 U.S. at 546.

## CONCLUSION

Gonsalves respectfully contends that this Court should affirm on the ground of waiver by Abuka or on the ground that qualified immunity insulates Gonsalves from 14th Amendment liability, or both.

Dated: September 30, 2019

Daley & Heft, LLP

By:

*/s/ Lee H. Roistacher*

Lee H. Roistacher
Mitchell D. Dean
Heather E. Paradis
Attorneys for Defendants and
Appellees City of El Cajon and
Richard Gonsalves

## CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. 32(a)(7)(c) AND CIRCUIT RULE 32-1 FOR CASE NO. 19-55335

Pursuant to Federal Rule of Appellate Procedure 32 (a)(7)(C) and Ninth Circuit Rule 32-1, I certify that Appellee's Brief is proportionately spaced, has a typeface of 14 points or more and contains 6,143 words.

Dated: September 30, 2019      Daley & Heft, LLP

By:

*/s/ Lee H. Roistacher*

Lee H. Roistacher
Mitchell D. Dean
Heather E. Paradis
Attorneys for Defendants and
Appellees City of El Cajon and
Richard Gonsalves

## STATEMENT OF RELATED CASES UNDER NINTH

## CIRCUIT RULE 28-2.6

Defendant-Appellee is not aware of any related case currently pending in the Ninth Circuit Court of Appeals.

Dated: September 30, 2019          Daley & Heft, LLP

By:

*/s/ Lee H. Roistacher*
_____
Lee H. Roistacher
Mitchell D. Dean
Heather E. Paradis
Attorneys for Defendants and
Appellees City of El Cajon and
Richard Gonsalves

<u>CERTIFICATE OF SERVICE</u>

Re:   *Richard Olango Abuka v. City of El Cajon, et al.*
      United States Court of Appeals for the Ninth Circuit
      Case No. 19-55335
      USDC Case Nos. 17-cv-0089-BAS-NLS, 17-cv-00347-BAS-NLS

I, Maria E. Kilcrease, declare:

That I am and was at the time of service of the papers herein referred to, over the age of 18 years, and not a party to the action; and I am employed in the County of San Diego, California.  My business address is 462 Stevens Avenue, Suite 201, Solana Beach, California 92075 and my electronic address is mkilcrease@daleyheft.com.

On September 30, 2019, I served the following documents described as:

<strong>APPELLEE'S BRIEF</strong>

on all interested parties in this action addressed as follows:

> Rodney S. Diggs
> Ivie McNeill & Wyatt
> Suite # 1800
> 444 S. Flower Street
> Los Angeles, CA 90071
> Email: rdiggs@imwlaw.com
> Attorneys for Appellants

<u>    X    </u>      BY ELECTRONIC SERVICE:  On the date stated above, I served the documents described above on designated recipients via CM/ECF.

I declare under penalty of perjury under the laws of the Unites States of America that the foregoing is true and correct.  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on September 30, 2019, at Solana Beach, California.

*/s/ Maria E. Kilcrease*
Maria E. Kilcrease, declarant